# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **WILHEMIA P. TUCKER,** | : | **Case No. 1:06-CV-2359** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **JOHN E. POTTER, Postmaster General,** | : | **OPINION & ORDER** |
| **Defendant.** | : | |

Two motions are currently pending before the Court in this action brought by Plaintiff Wilhemia P. Tucker against Defendant John E. Potter, Postmaster General of the United States Postal Service ("USPS"): (1) the USPS' *Motion to Dismiss and for Summary Judgment* (Doc. 34); and (2) the USPS' *Motion to Strike* (Doc. 42). For the reasons articulated herein, the Court **DENIES** the USPS' *Motion to Strike* (Doc. 42) and **GRANTS** the USPS' *Motion to Dismiss and for Summary Judgment* (Doc. 34).

## I.  BACKGROUND

On September 28, 2006, Tucker, a former USPS employee who was terminated in a Notice of Removal dated June 18, 2004, filed a *pro se* Complaint against the USPS. (Doc. 1, Compl.) While her Complaint is inartfully drafted and less than clear (understandably so because she was filing *pro se*), Tucker appears to allege the following three causes of action against the USPS with respect to her removal: (1) unlawful employment discrimination based on sex, race, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); (2) unlawful employment discrimination based on age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 *et seq.* ("ADEA"); and (3) breach of a settlement

agreement executed on June 7, 2004 by the USPS and the American Postal Workers Union ("APWU") on Tucker's behalf during the grievance process established under the terms of the Collective Bargaining Agreement ("CBA") by and between the USPS and the APWU.[1]

In May 2008, after the USPS answered Tucker's Complaint (*see* Docs. 9, 10) and the parties conducted some discovery, Tucker retained counsel and ceased proceeding *pro se* (*see* Doc. 31).

On August 18, 2008, Tucker moved to amend her Complaint (*see id.*), which the Court granted as unopposed in a non-document Order entered on September 18, 2008.  In the Amended Complaint, Tucker did not revise or edit any of the existing allegations in her original *pro se* Complaint, but instead only added allegations regarding her claim for breach of the June 7, 2004

---

[1]  The lack of clarity in Tucker's *pro se* Complaint arises because she appears to have copied, without reference or citation, a portion of the "Background" section from a decision issued by the United States Equal Employment Opportunity Commission ("EEOC") on June 20, 2006, affirming the agency's final order denying Tucker's EEO complaint (*compare* Doc. 1 at 6 *with* Doc. 34-10 at 2, EEOC Appellate Decision), as well as various passages from her brief to the EEOC (*see generally* Doc. 1 at 2-5).

In addition to the lack of clarity in the Complaint, the Court also notes that Tucker does not reference the ADEA, but instead merely alleges that the USPS violated Title VII.  As explained in more detail below, Title VII does not provide protection from age discrimination. *Briggs v. Potter*, 463 F.3d 507, 514 n.2 (6th Cir. 2006).  Instead, the ADEA is the federal statute that prohibits age discrimination. *Id.*  The Court, however, will treat Tucker's age discrimination claim as though it were properly brought under the ADEA.  *See id.*

And finally, the Court notes that, while Tucker states in her Complaint that she was discriminated against "in reprisal for engaging in the grievance process" (*see* Doc. 1 at 6), Tucker does not state a claim for retaliation under either Title VII or the ADEA.  Indeed, Tucker, now represented by counsel, effectively conceded this point by failing to contest (or even discuss) the USPS' explicit assertion in its motion to dismiss and for summary judgment that she had not alleged retaliation.  (*See* Doc. 34-2 at 10 n.3, USPS' Mot. to Dismiss and for Summ. J.; Doc. 38, Tucker's Br. in Opp'n.)  The Court finds, moreover, that any retaliation claim by Tucker nevertheless would fail on the merits, because, *inter alia*, Tucker's grievance activity prior to her removal did not raise the issue of discrimination and thus would not constitute "protected expression" under Title VII or the ADEA.  *See Kodl v. Bd. of Educ.*, 490 F.3d 558, 563 (7th Cir. 2007).

settlement agreement between the USPS and the APWU.  (Doc. 31-2.)[2]

On September 29, 2008, the USPS filed the pending motion to dismiss and for summary judgment.  (Doc. 34.)  In this pending motion, the USPS first moves to dismiss Tucker's claim that the USPS breached the June 7, 2004 settlement agreement with the APWU pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  The USPS then moves for summary judgment on Tucker's discrimination claims brought under Title VII and the ADEA pursuant to Fed. R. Civ. P. 56.[3]

On November 19, 2008, Tucker filed a brief in opposition to the USPS' motion to dismiss and for summary judgment.  (Doc. 38.)  Tucker opposed only the USPS' argument that it was entitled to summary judgment on her discrimination claims.  Tucker asserted that she was discriminated against based on sex, race, national origin, and age and that, as demonstrated by the deposition transcripts and declarations she submitted in conjunction with her brief, there are issues of fact that must be resolved at trial.  Tucker did not respond to the USPS' argument that her claim for breach of the settlement agreement between the USPS and the APWU on June 7, 2004 should be dismissed.

On December 15, 2008, the USPS filed a reply to Tucker's brief in opposition (Doc. 41) and the pending motion to strike (Doc. 42).  In the motion to strike, the USPS seeks to strike portions of Tucker's brief in opposition and a number of the declarations attached thereto as including inadmissible statements under Fed. R. Civ. P. 56(e).

---

[2]  The Court notes that it would have been helpful had Tucker's retained counsel taken the time and effort to clarify the allegations in the original *pro se* Complaint.

[3]  The USPS, like Tucker in her Complaint and Amended Complaint, did not reference the ADEA in its motion for summary judgment.  The USPS, however, does seek summary judgment on Tucker's age discrimination claim, so the Court will treat the USPS' motion as though it were properly seeking summary judgment on Tucker's ADEA claim.

To date, Tucker has not filed a response to the USPS' motion to strike.  As the time period for filing an opposition has expired, *see* Local Rule 7.1, the motion is now ripe for determination and will be analyzed in the context of the USPS' motion to dismiss and for summary judgment.

## II. STATEMENT OF FACTS

Below is a chronological account of the relevant facts related to Tucker's termination from the USPS in the Notice of Removal dated June 18, 2004.[4]  Nearly all of the relevant facts are undisputed.  Each factual dispute between the parties, however, is specifically identified below; otherwise, if not specifically identified, a fact is not deemed to be in dispute.[5]

### A. SUPERVISOR DEBORAH CZESCHIN PLACED TUCKER ON EMERGENCY PLACEMENT STATUS AS A RESULT OF AN INVESTIGATION BY POSTAL INSPECTOR DEAN MORRISON

Tucker is an African-American female over the age of forty years old (born on February 15, 1947) who began working for the USPS in 1976.  (Doc. 34-6 at 1, EEO Investigation Report; Doc. 38-41 at 1, Tucker Decl.)  After holding many positions at the USPS, including acting branch manager, in approximately 2002, Tucker became a sales, services, and distribution associate clerk (*i.e.*, a window clerk) at the Rocky River, Ohio Branch Post Office.  (Doc. 38-41 at 1; Doc. 34-11 at 7-8, Tucker Dep., Feb. 8, 2008.)

---

[4]  The facts were developed from the relatively expansive record in this case.  In this regard, the Court notes that a number of the parties' exhibits, if not all, were not properly authenticated under Fed. R. Civ. P. 56, as discussed in *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  None of the declarations in the record were notarized or submitted properly under 28 U.S.C. § 1746, as none included the date on which they were executed.  However, neither party objected to any of the exhibits on this ground, thereby waiving the issue.  *See Ricks v. Potter*, No. 1:06-CV-2426, 2009 U.S. Dist. LEXIS 27140, at *12 n.4, 20 n.7 (N.D. Ohio March 27, 2009) (citing *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 480 (6th Cir. 2008).

[5]  The separate and legally dispositive issue as to whether any of the disputed facts amount to a "genuine issue" of "material fact" under the summary judgment standard stated in Fed. R. Civ. P. 56 will be addressed below in the Law & Analysis section.

In late 2003, a series of audits of the Rocky River Branch revealed losses between approximately $4,000 and $8,000. (Doc. 38-12 at 7-8, Morrison Dep., Aug. 18, 2008; Doc. 34-6 at 78, Morrison Investigative Memorandum.)  As a result, the United States Postal Inspection Service initiated an investigation into the losses.  (*Id.*)

Postal Inspector Dean Morrison conducted the investigation of the Rocky River Branch.  (*Id.*) Inspector Morrison began his investigation by performing videotape surveillance on all of the window clerks that worked at the Rocky River Branch.  (*Id.*)[6]  Inspector Morrison viewed an individual clerk's actions and compared those actions with Retail Data Mart reports to determine if the data entered by the clerk in the USPS' Point of Sale ("POS") computer system matched what was observed on the videotapes.  (Doc. 38-12 at 7-8; Doc. 34-6 at 78.)

During the course of the investigation, Inspector Morrison observed all seven window clerks at the Rocky River Branch.  (Doc. 38-12 at 7-8, 15-16; Doc. 34-6 at 78; Doc. 41-3 at 2, Czeschin Second Decl.)  While Tucker repeatedly asserts in her brief in opposition that the other clerks were "white" (*see* Doc. 38 at 3-5, 7-9, 11, 13-14), the record demonstrates that Inspector Morrison was never asked about the observed clerks' race, gender, or age in his deposition and that, in fact, the observed clerks were of various races, genders, and ages (*see* Doc. 38-12; Doc. 41-3 at 1-2). Specifically, Inspector Morrison observed videotape surveillance of the following seven clerks:

------

[6]  According to Inspector Morrison, it was necessary to observe each and every window clerk to investigate the audit losses, because the Rocky River Branch was a "segmented inventory accountability" branch, which meant that window clerks did not have an "individual stamp accountability" and instead obtained stamps from a common "floor stock" that was available to all of the clerks.  (Doc. 34-6 at 78.)  Thus, any of the branch's audit losses could have been the result of one or more of the clerks' actions.  (*Id.*)

Further, Inspector Morrison noted that, because the Rocky River Branch was a retail store, theft by postal customers also could account for some or all of the losses.  (*Id.*)

(1)     Tucker (African-American female over the age of forty years old),

(2)     Valerie Thompson (African-American female over the age of forty years old),

(3)     Erwin Lauffer (white male over the age of forty years old),

(4)     Raul Rodriguez (Hispanic male over the age of forty years old),

(5)     Joseph Thomas (white male over the age of forty years old),

(6)     Terry Murray (white female over the age of forty years old), and

(7)     Dee Williams (African-American male under the age of forty years old and on loan from another branch).

(Doc. 41-3 at 1-2.)

Tucker was the only clerk observed by Inspector Morrison improperly manipulating the POS computer system, and, consequently, the investigation ultimately focused on her. (Doc. 38-12 at 16-22, 39; Doc. 34-6 at 79.)  While Inspector Morrison testified that he continued to observe all of the other clerks throughout his investigation,  he generally determined that a clerk was not guilty of any wrongdoing after reviewing videotape of that clerk for at least five days.  (Doc. 38-12 at 16-22.) Further, Inspector Morrison testified that, in part because of financial considerations at the USPS, he reused any videotapes that did not indicate a clerk was engaging in improper conduct.  (*Id.* at 16-25.)  Inspector Morrison, therefore, did not retain any videotapes of the other six clerks, and he preserved (*i.e.*, did not reuse) only the videotapes of Tucker that showed her engaging in improper conduct (*i.e.*, "[w]hen what was seen on the videotape was not matching what she was entering into the POS machine").  (*Id.* at 16-25, 38-39.)

On April 12, 2004, after approximately three months of investigating the Rocky River Branch, Inspector Morrison interviewed Tucker.  (*Id.* at 12-13; Doc. 34-6 at 68-74, Memorandum

of Interview; Doc. 34-6 at 83-86.)[7] Inspector Morrison informed Tucker that she had been observed improperly manipulating the POS computer system by using the "no sale" key to open her cash drawer when making a sale, voiding legitimate sales, under reporting sales, and removing money from her drawer and secreting it to the side prior to an audit.  (Doc. 34-6 at 72.)  Inspector Morrison told Tucker that her audits should have shown greater amounts of overages (*i.e.*, the amount of money in her cash drawer should have been greater than what was indicated by the amount of sales entered into the POS computer system).  (*Id.* at 72-73.)  In response, according to Inspector Morrison, Tucker denied engaging in any of the conduct described by Inspector Morrison or wrongdoing of any kind, and she provided no explanation as to why her audits did not show overages in an amount equal to the amount of postage sales that she failed to properly enter into the POS computer system.  (*Id.*)

Towards the end of the interview, Deborah Czeschin, a white female over the age of forty years old (born in 1960) and the then Acting Station Manager of the Rocky River Branch and Tucker's supervisor, was called into the room.  (*Id.* at 73-74; Doc. 34-12 at 1-2, Czeschin Decl.)  Supervisor Czeschin, who previously had been updated regarding the findings of Inspector Morrison's investigation and had seen the videotapes of Tucker manipulating the POS computer system, was informed of Tucker's responses during the interview.  (*Id.*)  In Supervisor Czeschin's presence, Tucker again denied engaging in any of the conduct described by Inspector Morrison or wrongdoing of any kind.  (*Id.*)  Tucker stated that she used the "no sale" key only to make change and/or when she forgot to give customers their change.  (Doc. 34-6 at 73.)

---

[7] Inspector Morrison conducted Tucker's interview with another postal inspector, F.W. Pihoker.  (Doc. 34-6 at 68.)

At that point, Supervisor Czeschin placed Tucker on emergency placement status pending further investigation and discipline.  (*Id.* at 74; Doc. 34-12 at 2; Doc. 34-13 at 1, Emergency Placement Notice.)  Emergency placement status is an unpaid, non-duty status under the terms of the CBA.  (Doc. 34-12 at 2; *see also* Doc. 34-5 at 17, CBA.)

## B.     TUCKER FILED A GRIEVANCE PROTESTING HER EMERGENCY PLACEMENT STATUS

On April 21, 2004, in response to Supervisor Czeschin's actions, the APWU filed a grievance on behalf of Tucker, as provided for under the terms of the CBA, protesting her emergency placement status.  (Doc. 34-6 at 88-89, Emergency Placement Grievance.)  In the emergency placement grievance, the APWU and Tucker did not assert, nor suggest in any way, that Supervisor Czeschin's or Inspector Morrison's actions were based on sex, race, national origin, or age discrimination.  (*See id.*)

Later that day, Supervisor Czeschin denied Tucker's emergency placement grievance at Step 1 of the grievance procedure.  (*Id.*)

## C.     THE USPS CONTINUED TO INVESTIGATE TUCKER

On April 29, 2004, Inspector Morrison prepared an Investigative Memorandum ("IM"), detailing his investigation and findings.  (Doc. 34-6 at 75-87.)  In the IM, Inspector Morrison reported that Tucker was observed manipulating the POS computer system on six separate dates, all of which revealed that Tucker failed to properly account for a total of $162.80 in postal funds.  (*Id.* at 77, 79-83.)  Specifically, Inspector Morrison indicated that:

> (1)     On January 13, 2004, Tucker was observed selling a $37.00 coil of stamps to a customer using the "no sale" function on the POS computer system to open her cash drawer instead of entering the sale of the coil in the system.  Tucker received $37.00 in cash for the purchase.  An audit of Tucker's cash drawer for that day disclosed an overage of $7.17.  However, if the funds that Tucker

had failed to enter into the system were kept in her cash drawer, she should have been over by at least $37.00.

(2)    On January 14, 2004, Tucker was observed repeatedly selling books of stamps to customers using the "no sale" function on the POS computer system to open her cash drawer instead of entering the sales of the books in the system. Tucker received a total of $22.20 in cash for the purchases. An audit of Tucker's cash drawer for that day disclosed an overage of $5.53. However, if the funds that Tucker had failed to enter into the system were kept in her cash drawer, she should have been over by at least $22.20.

(3)    On March 3, 2004, Tucker was observed selling a $37.00 coil of stamps to a customer using the "no sale" function on the POS computer system to open her cash drawer instead of entering the sale of the coil in the system. Tucker received $37.00 in cash for the purchase. An audit of Tucker's cash drawer for that day disclosed a shortage of $2.54. However, if the funds that Tucker had failed to enter into the system were kept in her cash drawer, she should have been over by at least $37.00.

(4)    On March 5, 2004, Tucker was observed selling two books of stamps to a customer using the "no sale" function on the POS computer system to open her cash drawer instead of entering the sale of the books in the system. Tucker received $14.80 in cash for the purchase. An audit of Tucker's cash drawer for that day disclosed a shortage of $2.84. However, if the funds that Tucker had failed to enter into the system were kept in her cash drawer, she should have been over by at least $14.80.

(5)    On March 11, 2004, Tucker was observed twice not properly handling postage sales. First, Tucker was observed selling one book of stamps to a customer using the "no sale" function on the POS computer system to open her cash drawer instead of entering the sale of the book in the system. Tucker received $7.40 in cash for the purchase. Second, Tucker was observed selling two books of stamps to a different customer but entering the sale on the POS computer system as a sale of only one book. Tucker received a $20.00 bill from the customer for the purchase, and she gave $5.20 in change rather than $12.60, which would have been the correct amount had there been a sale of only one book. An audit of Tucker's cash drawer for that day disclosed a shortage of $8.55. However, if the funds that Tucker had failed to enter into the system were kept in her cash drawer, she should have been over by at least $14.80.

(6)    On March 26, 2004, Tucker was observed selling a $37.00 coil of stamps to a customer. Tucker first entered the sale of the coil into the POS computer system, then "voided" the sale and used the "no sale" function to open her

-9-

cash drawer.  Tucker received $40.00 for the purchase, and she gave $3.00 in change to the customer.  An audit of Tucker's cash drawer for that day disclosed a shortage of $20.94.  However, if the funds that Tucker had failed to enter into the system were kept in her cash drawer, she should been over by at least $37.00.

(*Id.* at 79-83.)

On May 26, 2004, Supervisor Czeschin conducted a predisciplinary interview of Tucker. (Doc. 34-6 at 28, Notice of Removal; Doc. 34-7 at 11, Arbitration Decision.)  Tucker's APWU representative, James Dennis, also was present during the interview.  (Doc. 34-6 at 28.)  According to Supervisor Czeschin, Tucker acknowledged receiving a copy of Inspector Morrison's IM, and she once again denied ever manipulating the POS computer system (*i.e.*, using the "no sale" function when selling stamps or selling two books of stamps to a customer and entering a sale for only one book and taking the cash for the other).  (*Id.*; Doc. 34-7 at 11.)  Supervisor Czeschin later summarized Tucker's responses during the interview as follows:  "You [Tucker] had nothing further to add."  (Doc. 34-6 at 28; *see also* Doc. 34-6 at 91, Disciplinary Action Request.)

## D.  SUPERVISOR CZESCHIN INITIATED THE PROCESS OF TERMINATING TUCKER

On the following day, May 27, 2004, Supervisor Czeschin prepared and signed a Disciplinary Action Request, seeking to remove Tucker from employment with the USPS for the conduct outlined in Inspector Morrison's IM.  (Doc. 34-12 at 2; Doc. 34-6 at 90-91.)  Supervisor Czeschin then forwarded the request to her supervisor, Charliene Arrington, an African-American female over the age of forty years old (born in 1957) and the Manager of the Customer Services Operations for Area Three (the Northern Ohio Performance Cluster), for review and concurrence.  (*Id.*; Doc. 41-4 at 1-2, Arrington Decl.)  Manager Arrington signed the Disciplinary Action Request as the reviewing authority and sent the request to the USPS Labor Relations Department for further processing.  (*Id.*)

-10-

**E.      THE USPS AND APWU SETTLED TUCKER'S EMERGENCY PLACEMENT GRIEVANCE**

Meanwhile, on June 7, 2004, the USPS and APWU settled Tucker's emergency placement grievance at Step 2 of the grievance procedure.  (Doc. 34-6 at 93, Emergency Placement Settlement Agreement.)  The settlement agreement was negotiated by Jacquelyn Poindexter-Anderson on behalf of the USPS in her capacity as an acting Labor Relations Specialist and James Dennis on behalf of the APWU.  (*Id.*; Doc. 38-25 at 6, 13, 34, Poindexter-Anderson Dep., Aug. 6, 2008; Doc. 38-27 at 2, Dennis Decl.)  The settlement agreement, which Tucker now claims the USPS breached, provided that Tucker was to return to active duty status from emergency placement status the next day, June 8, 2004.  (Doc. 34-6 at 93.)[8]

The record is unclear as to exactly why Tucker's emergency placement grievance was settled at that time.  First, Acting Labor Relations Specialist Poindexter-Anderson testified that she was told by Theresa Coleman, a Customer Service Support Supervisor, that the Postmaster, Lori Wigley,

---

[8]  The settlement agreement dated June 7, 2004 provided as follows:

AS FINAL AND COMPLETE SETTLEMENT OF THE SUBJECT CASE AND WITHOUT PREJUDICE TO THE POSITION OF EITHER PARTY IN THIS OR ANY CASE AND WITH THE UNDERSTANDING THAT NEITHER PARTY WILL CITE THIS AGREEMENT AS A COMPARISON IN ANY OTHER CASE OR FORUM, THE SUBJECT CASE HAS BEEN RESOLVED ON THE FOLLOWING BASIS:

The grievant [Tucker] will be return to duty status [*sic*] from the Emergency Placement (April 12, 2004) effective June 8, 2004.  There is no back pay involved.

THE ABOVE CONSTITUTES A FULL AND COMPLETE SETTLEMENT OF THE SUBJECT CASE AND RESOLVES ANY OTHER ISSUES PERTAINING THERETO.

(*Id.* (emphasis in original).)

wanted to bring a number of people back to work, including Tucker.  (Doc. 38-25 at 13-14, 18-23; Doc. 38-26 at 7, Coleman Dep., May 28, 2008.)  Poindexter-Anderson testified that Coleman stopped her on two separate occasions in early June 2004, gave her a Post-It note with four or five names on it, including Tucker's, and said, "We want to bring these people back." (Doc. 38-25 at 13-14, 18-23.)  Poindexter-Anderson then testified that she settled Tucker's emergency placement grievance based on Coleman's statement, and she admitted that she should have investigated Tucker's case more fully.  (*Id.* at 13-14, 18-33.)  In fact, Poindexter-Anderson was reprimanded and reassigned from Labor Relations as a result of her failure to investigate various employees' cases, including Tucker's, before entering into settlement agreements at Step 2 of the grievance procedure. (*Id.* at 24-33.)  By contrast, Coleman testified that she had no involvement with the review of Tucker's emergency placement status other than to ask Poindexter-Anderson, at the request of the APWU, when Tucker and three other employees would be brought back to work.  (Doc. 38-26 at 13-23, 28, 38, 43; *see also* Doc. 38-7 at 1-2, Coleman Email.)  Coleman testified that she gave Poindexter-Anderson no indication as to whether Tucker and the other employees should be allowed to return to work: "Only when she [Poindexter-Anderson] said that she could bring them back, . . . I said, 'Okay, fine, bring them back.'" (Doc. 38-26 at 43; *see also id.* at 13-23, 28, 38.)  And finally, according to a declaration submitted by James Dennis, Tucker's APWU representative, Poindexter-Anderson took the position at Step 2 that Tucker's actions did not constitute theft and that there was no just cause for such accusations.  (Doc. 38-27 at 1-2.)  Consequently, Dennis declares that he met with Poindexter-Anderson and Coleman on June 7, 2004, and they resolved Tucker's case, along with several other cases.  (*Id.*)[9]  In this regard, Dennis declares that the "intent" of the agreement at

---

[9] According to Dennis, the other cases resolved on June 7, 2004 involved the following USPS employees:  Karen Brooks, Sillus Cox, D. Tornie Jackson, and Carl Gunn.  (*Id.* at 2.)

the time of signing it "was to resolve all issues and bring finality to all allegations" lodged against Tucker.  (*Id.*; *see also* Doc. 38-39 at 2, Joyce Williams Decl. ("It was an understanding between the Postmaster Liaison Teresa [*sic*] Coleman and me that the employee [Tucker] was to be returned to duty without any further disciplinary action.").)

## F. TUCKER RETURNED TO WORK AT THE USPS BUT WAS LATER PLACED ON PAID ADMINISTRATIVE LEAVE BY SUPERVISOR CZESCHIN

In any event, regardless to as to why Tucker's emergency placement grievance was settled on June 7, 2004, Tucker returned to active duty status on June 8, 2004 pursuant to the settlement agreement, and she reported to work at the Rocky River Branch.  (Doc. 34-11 at 3-4; Doc. 34-12 at 2-3.)

Supervisor Czeschin, however, had not been informed of the settlement of Tucker's emergency placement grievance prior to Tucker's return to duty on June 8, 2004.  (Doc. 34-12 at 2-3.) Supervisor Czeschin immediately contacted Labor Relations when Tucker reported to the Rocky River Branch to see why the grievance was settled while Tucker's removal was pending and to determine what options, if any, were available to remove Tucker from the workplace while the removal was being investigated and finalized.  (*Id.*)  In response, Labor Relations Representative Larry Zoloty advised Supervisor Czeschin that the USPS' Employee Labor Manual permitted her to place Tucker on paid administrative leave while Tucker's adverse action of removal was being investigated and finalized.  (*Id.*; *see also* Doc. 34-6 at 94, Zoloty Email.)  Accordingly, Supervisor Czeschin placed Tucker on paid administrative leave that afternoon, just hours after Tucker had returned to work.  (Doc. 34-12 at 2-3; Doc. 34-11 at 3-4.)

### G.    TUCKER WAS TERMINATED IN A NOTICE OF REMOVAL

On June 18, 2004, Tucker was issued a Notice of Removal, terminating her from USPS employment as of July 23, 2004.  (Doc. 34-6 at 25-30.)  Tucker was charged with the following based upon Inspector Morrison's IM, the videotapes, and her interview responses:  (1) conduct unbecoming a postal employee; (2) failure to account for postal funds; and (3) falsification of postal records.  (*Id.* at 25.)  Both Supervisor Czeschin and Manager Arrington, who were responsible for removing Tucker from USPS employment, noted that Tucker's removal was *not* based upon her cash drawer being "out of tolerance" (*i.e.*, over or short more than $5.00) at various times; instead, the removal was based upon Tucker's manipulation of the POS computer system, a practice that Supervisor Czeschin and Manager Arrington indicated was an extreme departure from accepted postal procedure that left the system vulnerable to losses and theft.  (Doc. 34-12 at 3-5; Doc. 41-4 at 2-3.)  In this regard, however, it is undisputed that Tucker was not charged with theft – either criminally or as the basis for her removal – and that Inspector Morrison admitted that he did not observe Tucker taking any money, stamps, or mail out of the Rocky River Branch.  (Doc. 41 at 4; Doc. 38-12 at 14.)

### H.    TUCKER FILED GRIEVANCES PROTESTING HER TERMINATION

On June 21, 2004, and again on July 2, 2004, the APWU filed separate grievances on behalf of Tucker, both of which alleged that her removal violated the terms of the CBA and was discriminatory.  (Doc. 34-6 at 102-03 ("The Union contends management's [the USPS'] action is not for just cause, harassing, and discriminatory."); Doc. 34-6 at 112-13.)  Neither of the grievances, however, elaborated on the nature or extent of the discrimination alleged to be at issue.  (*See id.*)

The two grievances were denied at Step 1 and Step 2 of the grievance procedure, and the

-14-

APWU sought arbitration.  (Doc. 34-6 at 95; Doc. 34-6 at 105.)

## I.     TUCKER'S GRIEVANCE WAS DENIED AT ARBITRATION

At the arbitration stage, the arbitrator held a hearing on January 14, 2005 that included the presentation of live testimony and a viewing of Inspector Morrison's videotape surveillance, and she ultimately issued a decision on March 28, 2005, upholding Tucker's removal as proper and denying her grievance.  (Doc. 34-7 at 1-33.)[10]  The arbitrator first noted that the USPS did not breach the June 7, 2004 settlement agreement with the APWU.  (Doc. 34-7 at 23-30.)  The Arbitrator wrote that the Step 2 settlement of Tucker's emergency placement grievance "did not resolve the removal" as contended by the APWU; the "specific language of the settlement cannot be interpreted to mean that the parties intended to protect the grievant [Tucker] from further discipline."  (Doc. 34-7 at 24; *see also id.* at 25 ("What occurred here was two separate actions taken by Management [the USPS] based upon the observations of the Postal Inspector [Morrison] and the results of the prediscipl inary interview conducted by the Supervisor [Czeschin].  These are two separate cases.  The settlement of the emergency placement grievance contains exclusionary language and that settlement did not resolve the issue of the removal.  What occurred here is not 'double jeopardy.'").)  The arbitrator then ruled that the evidence clearly and convincingly established that Tucker engaged in the charged behavior as outlined in the Notice of Removal and that this behavior warranted Tucker's termination despite her length of service and her prior record.  (Doc. 34-7 at 30-33.)

---

[10]  The record is unclear, but it appears that the arbitrator ruled only on the grievance dated July 2, 2004, even though both grievances were appealed to arbitration.  (Doc. 34-7 at 21; Doc. 34-6 at 95; Doc. 34-6 at 105.)  There is nothing in the record discussing an arbitration of the grievance dated June 21, 2004.

According to the terms of the CBA, the arbitrator's decision denying Tucker's grievance was to be a final and binding decision.  (Doc. 34-2 at 9.)[11]

**J.     TUCKER'S EEO COMPLAINT WAS DENIED BY AN ADMINISTRATIVE JUDGE AND THE EEOC**

While the grievance proceedings were pending, Tucker contacted an EEO counselor on June 28, 2004 (*see* Doc. 34-6 at 20-24, Information for Pre-Complaint Counseling) and filed a formal administrative EEO complaint on August 30, 2004 (*see* Doc. 34-6 at 14-15, EEO Complaint of Discrimination in the Postal Service).

On September 30, 2005, an Administrative Judge ("AJ") of the EEOC issued a decision without a hearing, dismissing Tucker's EEO complaint.  (Doc. 34-9 at 1-9, AJ's EEOC Decision.) The AJ held that Tucker:  (1) failed to establish a *prima facie* case of race, national origin, sex, and age discrimination, because she did not identify any similarly situated co-worker not in her protected groups who was treated more favorably under similar circumstances; and (2) failed to establish a *prima facie* case of retaliation, because she did not engage in any protected activity prior to being terminated.  (*Id.* at 7.)  Further, the AJ noted that Tucker's EEO complaint – in particular the claim for breach of the emergency placement settlement agreement – was an impermissible collateral attack on the grievance process and should be dismissed for failure to state a claim.  (Doc. 34-9 at 7-8.)

On June 20, 2006, the EEOC affirmed the AJ's decision denying Tucker's EEO complaint. (Doc. 34-10 at 1-7.)

---

[11]  Even though the USPS did not attach the relevant portion of the CBA (*see* Doc. 34-5 at 11-12), Tucker did not refute the USPS' assertion that the arbitrator's decision was to be final and binding.

**K.     TUCKER LATER ADMITTED THAT SHE IMPROPERLY MANIPULATED THE POS COMPUTER SYSTEM BUT EXPLAINED THAT SHE WAS TRYING TO REDUCE THE LENGTH OF THE LINES AT THE ROCKY RIVER BRANCH**

After filing her Complaint in this Court, Tucker admitted in deposition that she did improperly manipulate the POS computer system and failed to follow USPS' procedures.  (Doc. 34-11 at 15-17, 20-22.)   In direct contravention to what she told Inspector Morrison and Supervisor Czeschin (*i.e.*, that she did not engage in any of the behavior outlined in the IM), Tucker admitted that she improperly used the "no sale" function in violation of established postal procedures. (*Compare* Doc. 34-6 at 72-74 *with* Doc. 34-11 at 15-17, 20-22.)  For instance, when asked about the allegation outlined in the IM that she sold a $37.00 coil of stamps by using the "no sale" function to open her cash drawer on January 13, 2004, Tucker testified:

> A.     Okay.  Let me see.  If the customer gave me $37.00, nine times out of ten they came in – they were one of my regular customers. . . . They came in, handed me $37.00, and I gave them a [stamp] coil.  And then when the next – and I know that they did not want a receipt.  So I would – I set the money right there and then when the next person came, I rang up whatever it was for two.
>
> Q.     I don't understand.
>
> A.     Okay.  Maybe the next person came in and bought a book of stamps.  Okay. So I would ring up $37.00 plus $6.40.  And then hit the cash receipt.
>
> **Q.     Okay.  So you would make – you would combine two transactions –**
>
> **A.     Right.**
>
> **Q.     – into one?**
>
> **A.     Which is bad.  Which I shouldn't have done.  I know it's bad.**
>
> **Q.     And what would be against postal policy –**
>
> **A.     Right.**
>
> **Q.     – for doing that?**

-17-

    A.    Hm-hm.

(Doc. 34-11 at 15 (emphasis added).)  Tucker also admitted in a declaration that she submitted with

her brief in opposition that the videotapes showed her using the "no sale" function when selling

stamps (as opposed to using the "no sale" function only when making change).  (Doc. 38-41 at 1.)[12]

    Tucker explained in her deposition and declaration that she manipulated the POS computer

system in an attempt to reduce the length of the lines at the Rocky River Branch.  (Doc. 34-11 at 15-

16; Doc. 38-41 at 1-2.)  Tucker stated that, because there often were long lines at the branch, and

because the POS computer system was slow to process sales, she would combine two transactions

or enter the transaction at the end of the day to shorten the waiting periods for customers.  (*Id.*)

    There is no indication in the record, however, that Tucker offered this explanation to the

USPS before her deposition in February 2008, let alone before she filed her *pro se* Complaint in this

Court in September 2006.

### III.  LAW & ANALYSIS

    The Court will first address the USPS' motion to strike and then analyze the merits of the

USPS' motion to dismiss and for summary judgment.

A.    **THE USPS' MOTION TO STRIKE (DOC. 42)**

    As noted, in its motion to strike, the USPS seeks to strike portions of Tucker's brief in

opposition and a number of the declarations attached thereto as including inadmissible statements

---

    [12]  Tucker, however, also submits declarations from three APWU officials or
representatives who suggested that the videotapes did not show Tucker manipulating the POS
computer system.  (Doc. 38-27 at 2 ("The videotapes the postal inspectors made of Ms. Tucker
did not visually show any post funds being taken by her or the manipulation of post office
property."); Doc. 38-38 at 2, Jacqueline Stewart Harris Decl. ("I reviewed the evidence presented
by the Postal Inspectors and review [*sic*] the videotapes and POS records without any evidence
Ms. Tucker manipulated the system or took any funds or property from USPS."); Doc. 38-40 at
2, Violetta Ward Decl. (same).)

-18-

under Fed. R. Civ. P. 56(e).  In particular, the USPS contends that certain (albeit not explicitly

identified) statements in the declarations of James Dennis (Doc. 38-27), Jacqueline Stewart-Harris

(Doc. 38-38), Joyce Williams (Doc. 38-39), and Violetta Ward (Doc. 38-40) – all of whom are

APWU officials or representatives who assisted Tucker in the grievance process – should be stricken

from the record as legally irrelevant, unduly prejudicial, not based on personal knowledge, and/or

inadmissible hearsay.

      To date, Tucker has not filed a response to the USPS' motion to strike, and the time period

for filing an opposition under the Local Rules has long since expired.

      As an initial matter, the Court notes that, while Defendants seek to strike portions of the

challenged declarations based on Fed. R. Civ. P. 56(e), this provision does not authorize courts to

strike matters from the record; it only requires that supporting or opposing affidavits "set out facts

that would be admissible in evidence."  The only procedural rule with which this Court is aware that

discusses a court's authority to strike items from the record is Fed. R. Civ. P.12(f), which permits

striking matters only from pleadings.  While some courts have employed Fed. R. Civ. P.12(f) to

strike an affidavit or a brief, or portions thereof, there is no basis in the Federal Rules for doing so.

*McLaughlin v. Copeland*, 435 F. Supp. 513 (D. Md. 1977).  In fact, a decision in this district,

affirmed by the Sixth Circuit Court of Appeals, refused to employ Fed. R. Civ. P. 12(f) to strike an

affidavit because "the rule relates only to pleadings and is inapplicable to other filings."  *Dawson

v. City of Kent*, 682 F. Supp. 920 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988); *see also

Zerman v. City of Strongsville*, No. 1:04-CV-2493, 2006 U.S. Dist. LEXIS 70503, at *21-26 (N.D.

Ohio Sept. 28, 2006), *aff'd*, 259 Fed. Appx. 723 (6th Cir. 2008).  Accordingly, a motion to strike

pursuant to either Fed. R. Civ. P. 56(e) or 12(f) is not the proper vehicle for the USPS' request, and

its motion to strike must be denied.

Having said that, however, it remains true that the Court should not consider materials that are tendered in a manner not authorized by the Federal Rules of Evidence when analyzing the USPS' motion to dismiss and for summary judgment.  Hence, while the Court declines to strike any matters from the record, it will not consider the challenged declaration testimony offered by Dennis, Stewart-Harris, Williams, and Ward that violates Fed. R. Civ. P. 56(e) and, therefore, has excluded from its consideration those portions of the declarations that are legally irrelevant, unduly prejudicial, not based on personal knowledge, and/or inadmissible hearsay.  In this regard, the Court notes that most, if not all, of the challenged declaration testimony has no legal relevance to any issue raised by the USPS' motion to dismiss and for summary judgment, and that, unless the Court specifically cites or states that it is relying on a portion of a challenged declaration, the parties should assume that the Court deemed the remainder of the challenged declaration irrelevant or inadmissible.  Because the USPS does not explicitly identify which portions of the record should be stricken, and Tucker has not responded to the USPS' motion, the Court need not scrutinize each line of the challenged declarations in the context of the motion to strike.  *Cf. Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS)(HBP), 2007 U.S. Dist. LEXIS 4595, at *10-13 (S.D.N.Y. Jan. 24, 2007).

**B.**      **THE USPS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT (DOC. 34)**

In resolving the USPS' motion to dismiss and for summary judgment, the Court initially notes that, pursuant to Fed. R. Civ. P. 12(d), it will treat the motion as one strictly for summary judgment under Fed. R. Civ. P. 56, because the USPS has presented materials outside of the pleadings that were not excluded by the Court in its analysis.

**1.**      **Legal Standards Governing Summary Judgment Motions**

-20-

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions and provides in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials

in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"; rather, "Rule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87.

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Id.*; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted).

> **2.     The USPS Is Entitled To Summary Judgment On Tucker's Claim That The USPS Breached The June 7, 2004 Settlement Agreement With The APWU**

As noted, Tucker claims that the USPS breached the June 7, 2004 settlement agreement that resolved Tucker's emergency placement grievance.  Specifically, Tucker alleges in her Amended Complaint:  "This agreement was binding on the parties and the subsequent act of the USPS

supervisor [Czeschin] terminating Ms. Tucker on June 8, 2004 with a final removal based on the same evidence and allegations, which were the supporting evidence for the 'First' Emergency Placement was a breach of the June 7, 2004 agreement."  (Doc. 31-2 at 2.)

In the pending motion, the USPS argues that Tucker's claim regarding the June 7, 2004 settlement agreement should be dismissed.  The USPS contends that the arbitration decision denying the APWU's grievance protesting Tucker's removal was a final and binding decision that renders Tucker's claim unreviewable by this Court.  In other words, even though the USPS does not identify the doctrine by name or discuss its requirements, it appears that the USPS is seeking dismissal of Tucker's claim under the doctrine of collateral estoppel, or issue preclusion, based on the facts already determined in favor of the USPS by the arbitrator.  (*See* Doc. 34-2 at 9 ("Plaintiff [Tucker] simply cannot use this forum to end-run the binding arbitration decision, wherein the arbitrator found that the evidence clearly established that Plaintiff engaged in egregious misconduct which warranted her termination and that the settlement of her Emergency Placement did not effect [*sic*] the propriety of her discharge. . . . Indeed, with respect to the findings rendered in the arbitration decision, that decision is by its terms final and binding and this Court lacks jurisdiction to review the same.").)

Tucker, in her brief in opposition, did not respond to the USPS' argument that her claim for breach of the settlement agreement should be dismissed, and she apparently has abandoned this claim.  (*See* Doc. 38 at 1 ("Plaintiff's claim is sex, race, and age based discrimination in employment.").)[13]

Upon review of this portion of the USPS' motion, the applicable law, and the entire record

_____

[13]  Notably, Tucker also wrote in her brief in opposition that she opposed the USPS' motion for summary judgment, but she did not mention, let alone discuss, the USPS' motion to dismiss, which related only to Tucker's claim that the USPS breached the June 7, 2004 settlement agreement.  (*Id.*)

-23-

in this action – most notably, the arbitration decision dated March 28, 2005 denying Tucker's grievance that her removal violated the terms of the CBA – the Court concludes that the USPS is entitled to summary judgment on Tucker's claim that the USPS breached the June 7, 2004 settlement agreement for three related but independent reasons.

First, the Court finds that Tucker is precluded from litigating this issue under the doctrine of collateral estoppel because of the arbitrator's finding that the USPS did not breach the June 7, 2004 settlement agreement.  In general, collateral estoppel "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Bilali v. Gonzales*, 502 F.3d 470, 474 (6th Cir. 2007) (quoting *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984)).[14]  To successfully invoke collateral estoppel and bar litigation of an issue, a party must demonstrate the following four requirements:

    (1)    the precise issue must have been raised and actually litigated in the prior proceedings;

    (2)    the determination of the issue must have been necessary to the outcome of the prior proceedings;

    (3)    the prior proceedings must have resulted in a final judgment on the merits; and

    (4)    the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the relevant issue.

*Cobbins v. Tenn. Dep't of Transp.*, No. 07-6491, 2009 U.S. App. LEXIS 8365, at *18 (6th Cir. Apr.

---

[14]  It is unclear whether the federal or Ohio law of collateral estoppel should be applied to determine whether the arbitrator's decision precludes the Court from considering Tucker's claim. There is no need to conclusively resolve this question, however, because the courts of Ohio generally apply collateral estoppel in a manner consistent with the Supreme Court's view of the doctrine. *Thomas v. Thistledown, Inc.*, No. 1:05-CV-2138, 2009 U.S. Dist. LEXIS 17352 (N.D. Ohio Feb. 20, 2009), at *12 n.4 (quoting *McKinley v. City of Mansfield*, 404 F.3d 418, 429 n.9 (6th Cir. 2005)).  Further, out of an abundance of caution, the Court will provide citations to both federal and Ohio collateral estoppel law in its analysis.

-24-

2, 2009) (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987)); *see also Knott v. Sullivan*, 418 F.3d 561, 567-68 (6th Cir. 2005) (discussing similar requirements to invoke collateral estoppel under Ohio law); *Dye v. City of Warren*, 367 F. Supp. 2d 1175, 1184-85 (N.D. Ohio 2005) (same).[15]  Complete identity of parties is not required for collateral estoppel to apply, *see Thomas*, 2009 U.S. Dist. LEXIS 17352, at *13 (citing *Hancock v. Ohio*, No. 98-3297, 1999 U.S. App. LEXIS 29715, at *4 (6th Cir. Nov. 5, 1999)); *see also Frank v. Simon*, 2007 Ohio 1324, ¶12 (Ohio Ct. App. 2007), and, in particular, collateral estoppel "applies to those parties in privity with the named party" involved in the previous litigation, *Central Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 n. 2 (6th Cir. 1991); *see also Thompson v. Wing*, 637 N.E.2d 917, 923-24 (Ohio 1994).  A party in privity with the named party can be "a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented." *Union of Needletrades v. Am. Capital Strategies, Ltd.*, 546 F. Supp. 2d 546, 556 (S.D. Ohio 2008) (quoting *U.S. v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007)).  Further, courts generally

---

[15]  The Court in *Dye* wrote that the law in Ohio regarding collateral estoppel was well-settled:

> In order to assert collateral estoppel successfully, a party must plead and prove the following elements:
>
> (1)    The party against whom estoppel is sought was a party or in privity with a party to the prior action;
>
> (2)    There was a final judgment on the merits in the previous case after a full and fair opportunity to litigate the issue;
>
> (3)    The issue must have been admitted or actually tried and decided and must be necessary to the final judgment; and
>
> (4)    The issue must have been identical to the issue involved in the prior suit.

367 F. Supp. 2d at 1184.

-25-

give "estoppel effect to issues actually litigated in an arbitration proceeding between the same parties [and those parties in privity] unless the procedures were unfair." *Central Transp., Inc.*, 936 F.2d at 260 (citing *Ivery v. United States*, 686 F.2d 410, 413-14 (6th Cir. 1982)); *see, e.g.*, *United States v. Guy*, 257 Fed. Appx. 965, 967-68 (6th Cir. 2007) (per curiam); *Bear, Stearns & Co. v. 1109580 Ont., Inc.*, 409 F.3d 87, 91 (2d Cir. 2005); *Mata v. County of Berrien*, No. 1:96-CV-770, 1997 U.S. Dist. LEXIS 19344, at *23-30 (W.D. Mich. Oct. 29, 1997); *In re: Robinson*, 256 B.R. 482, 487-89 (Bankr. S.D. Ohio 2000); *see also Ford Hull-Mar Nursing Home, Inc. v. Marr Knapp Crawfis & Assoc., Inc.*, 740 N.E.2d 729, 734 (Ohio Ct. App. 2000) (citing *Cleveland v. Assn. Of Cleveland Fire Fighters*, 485 N.E.2d 792, 798 (Ohio Ct. App. 1984)); *Mowls v. Ohio Power Co.*, No. 97AP080052, 1998 Ohio App. LEXIS 5243, at *10-11 (Ohio Ct. App. 1998).

Here, all the requirements for collateral estoppel have been met to preclude Tucker from litigating her claim that the USPS breached the June 7, 2004 settlement agreement. The precise issue regarding the settlement agreement was raised and actually litigated during the arbitration proceedings resolving Tucker's grievance; the determination of the issue was necessary to the outcome of the arbitration; the arbitration decision represented a final and binding decision on the merits denying her grievance; and Tucker's privy – the APWU – had a full and fair opportunity to litigate the issue. (*See* Doc. 34-7 at 1-33.) In a lengthy and well-reasoned decision, the arbitrator concluded that "the settlement applied only to [Tucker's] emergency placement and said settlement [had] no bearing on 'any other case,'" *i.e.*, "the settlement did not 'resolve the removal' as contended by the [APWU]; being returned to duty [did] not equate to being exonerated; [and] the settlement [agreement] contain[ed] no language to suggest that there would be no further discipline based upon the discussions which occurred during the May 26 predisciplinary interview." (*Id.* at 24.)

Accordingly, because Tucker has not challenged this aspect of the USPS' motion, and does not otherwise suggest that the arbitration decision should not be given preclusive effect, the Court concludes that Tucker's claim that the USPS breached the June 7, 2004 settlement agreement should be dismissed under the doctrine of collateral estoppel.[16]

Second, to the extent that Tucker's claim for breach of the June 7, 2004 settlement agreement represents an attempt to vacate or modify the arbitrator's decision, the Court finds that Tucker lacks standing to seek such an order.  Under the Postal Reorganization Act, 39 U.S.C. § 1208(b), the analogue to § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), "individual union members lack standing to sue to vacate a binding arbitration award; an individual can sue only when the union has violated its duty to represent her."  *Goodman v. Potter*, No. 01-1801, 2003 U.S. Dist. LEXIS 11004, at *10 (D.D.C. Jan. 29, 2003) (granting USPS' motion for summary judgment on a claim filed by an USPS employee who was seeking to reverse an arbitration decision that denied her

---

[16]  In this regard, however, the Court notes that, as conceded by the USPS, the arbitration decision does not affect Tucker's ability to litigate her statutory discrimination claims and, in fact, has no estoppel effect on those claims.  *See Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 547-49 (noting that "an employee is not barred from bringing a subsequent statutory claim against her employer based on the same conduct, because arbitration over contractual disputes under a collective bargaining agreement is of a 'distinctly separate nature' than 'independent statutory rights accorded by Congress'" (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49-50 (1974))).  So, while the Court finds that Tucker is precluded from litigating her non-statutory claim for breach of the settlement agreement as a result of the arbitration decision, *cf. id.* at 547 n.2 ("[W]hile *Alexander* stands for the proposition that the vindication of rights pursuant to statute is not precluded by res judicata, an employee may not be able to proceed with pendent state law claims (such as Nance's claim that Goodyear violated the duty of good faith and fair dealing)."), the Court acknowledges that the arbitration decision does not preclude Tucker from relitigating matters relating to her statutory claims, and that it must conduct a de novo review of all such issues, *id.* at 549 ("When an employee such as Nance seeks to vindicate her federal rights to be free from discrimination, we must review all factual issues – including contractual ones – de novo. . . . Thus, whether the arbitration is 'similar to, or duplicative of, the substantive rights secured by [the ADA,] . . . a prior arbitration does not preclude us from reconsidering all factual issues underlying a statutory claim.") (citations omitted).

-27-

employment-related grievance).  In other words, in order for Tucker to have properly challenged the arbitration decision – or more specifically in this case, challenge the arbitrator's finding that the USPS did not breach the June 7, 2004 settlement – Tucker must have filed an action against both the USPS and the APWU under 39 U.S.C. § 1208(b).  *See id.* at *9-12; *see also Newby*, 480 F. Supp. 2d at 997-98.  A successful "hybrid § 1208(b) claim" – which requires that an employee prove that: (1) the union breached its duty of fair representation during the grievance-arbitration process; and (2) the employer violated the terms of its collective bargaining unit with the union – is the exception to the rule that "the results obtained by the union are ordinarily conclusive of the employee's rights under the [collective bargaining] agreement."  *Newby*, 480 F. Supp. 2d at 997-98.

Here, however, Tucker has not filed a hybrid § 1208(b) claim, *i.e.*, she has not sued the APWU, and she makes no allegation that the APWU failed to represent her properly.  Accordingly, Tucker has no standing to attack the arbitrator's decision that the USPS did not breach the June 7, 2004 settlement agreement, because she "cannot escape the binding effect of the arbitrator's decision without alleging, and proving, that not only was the arbitrator wrong under the contract but also that the [APWU] failed to represent her properly and thereby undermined the entire arbitral process."  *Goodman*, 2003 U.S. Dist. LEXIS 11004, at *11; *accord McDaniel v. Potter*, Nos. 1:06-CV-803 & 1:06-CV-1371, 2007 WL 3165807, at *13-14 (N.D. Ohio Oct. 26, 2007) (construing breach of contract claim as a claim brought under 39 U.S.C. § 1208(b) where a *pro se* postal worker alleged that the USPS violated a settlement agreement reached during a contractual grievance procedure and finding that claim to be deficient because the postal worker "neither claimed nor attempted to

establish a breach of the APWU's duty of fair representation").[17]

And third, again to the extent that Tucker seeks an order to vacate or modify the arbitrator's decision by bringing her claim that the USPS breached the June 7, 2004 settlement agreement, the Court finds that, even if Tucker had the requisite standing, she still has not successfully challenged the arbitrator's decision.  Under clearly established law, arbitration decisions reached under the terms of a collective bargaining agreement are not subject to judicial review on the merits.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("Judicial review of a labor-arbitration decision pursuant to such an agreement is very limited.  Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement."); *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987) ("[C]ourts play only a limited role when asked to review the decision of an arbitrator.").  In fact, under binding Sixth Circuit precedent, federal courts have no basis to vacate or modify an arbitration decision unless:  (1) the arbitrator exceeded the scope of his authority by resolving a dispute not committed to arbitration; (2) the arbitrator committed fraud, had a conflict of interest, or otherwise acted dishonestly in issuing the decision; or (3) the arbitrator unquestionably did not construe or apply the contract to resolve the legal or factual dispute.  *Mich. Family Res., Inc. v. SEIU Local 517M*, 475 F.3d 746, 753 (6th Cir.2007) (en banc).

Here, however, Tucker has not presented any argument or rationale to justify vacating or modifying the arbitrator's decision, and the Court otherwise does not find any basis for disturbing

---

[17]  There is also a six-month statute of limitations for instituting a suit claiming breach of a union's duty of fair representation.  *See Del Costello v. Int'l Brd. of Teamsters*, 462 U.S. 151, 169-72 (1983); *Goodman*, 2003 U.S. Dist. LEXIS 11004, at *11 n.5 (citing 29 U.S.C. § 160(b)).  As the arbitration decision was rendered on March 28, 2005, Tucker is now time-barred from instituting an action against the APWU under 39 U.S.C. § 1208(b).

the decision under the highly deferential standard applicable to arbitration awards.  Accordingly, Tucker's claim that the USPS breached the June 7, 2004 settlement agreement – to the extent that the claim represents a challenge to the binding arbitration decision – should be dismissed.

In sum, as pointed out by the USPS, Tucker simply cannot use this forum to "end-run" the final and binding arbitration decision, and the USPS therefore is entitled to summary judgment on Tucker's claim that the USPS breached the June 7, 2004 settlement agreement with the APWU.

### 3. The USPS Is Entitled To Summary Judgment On Tucker's Title VII And ADEA Discrimination Claims

As noted, Tucker claims that the USPS discriminated against her on the basis of sex, race, national origin, and age.

Although Tucker's Complaint and her brief in opposition to the USPS' motion to dismiss and for summary judgment reference only Title VII, her discrimination allegations actually contemplate violations of both Title VII and the ADEA.  (*See generally* Docs. 1, 38.)[18]  "Title VII prohibits discrimination in employment on the basis of race, color, religion, sex, and national origin, 42 U.S.C. § 2000e-2, and provides the exclusive remedy for such claims in federal employment."  *Hunter v. Sec'y of United States Army*, No. 08-1721, 2009 U.S. App. LEXIS 10638, at *11 (6th Cir. May 18, 2009).  "The ADEA bans age discrimination in employment against persons over 40, 29 U.S.C. §§ 623(a)(1), 631(a), and likewise provides the exclusive remedy for federal-employment age-discrimination claims."  *Hunter*, 2009 U.S. App. LEXIS 10638, at *11.

Employment discrimination claims under Title VII and the ADEA are analyzed under the same basic evidentiary framework.  *Ricks v. Potter*, No. 1:06-CV-2426, 2009 U.S. Dist. LEXIS

---

[18]  *See supra*, note 1, discussing how the Court is construing Tucker's age discrimination claim as though it were properly brought under the ADEA.

-30-

27140, at *8 (N.D. Ohio March 27, 2009) (quoting *Grosjean v. First Energy Corp.*, 349 F.3d 332,

335 (6th Cir. 2003)); *see also Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir.

2002).  Given this similarity, and the fact that both parties did not distinguish between the claims in

their briefing (or, in fact, even acknowledge the ADEA), the Court will analyze Tucker's claims

under Title VII and the ADEA together.[19]

      Under Title VII and the ADEA, a plaintiff can establish discrimination either by: (1)

presenting direct evidence of discrimination; or (2) presenting circumstantial evidence from which

a jury could infer discrimination under the three-stage, burden-shifting framework first instituted in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dep't of Cmty.*

*Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Briggs*, 463 F.3d at 514, 517.  "The direct evidence and

the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other,

not both."  *Kline v. TVA*, 128 F.3d 337, 348-49 (6th Cir. 1997).

### a.      Tucker Has Not Presented Direct Evidence Of Discrimination

      Direct evidence of discrimination is evidence that, if believed, requires the conclusion that

unlawful discrimination was a motivating factor in the employer's action.  *Briggs*, 463 F.3d at 514

---

[19]  The Court, however, notes that the ADEA is materially different than Title VII with
respect to the relevant burden of persuasion ultimately necessary to establish employer liability.
*See Gross v. FBL Financial Servs., Inc.*, 129 S. Ct. 2343, 2009 U.S. LEXIS 4535, at *12 (U.S.
June 18, 2009).  The Supreme Court recently wrote in *Gross*, "Unlike Title VII, the ADEA's text
does not provide that a plaintiff may establish discrimination by showing that age was simply a
motivating factor."  *Id.* at *13.  Instead, the Supreme Court held that "a plaintiff bringing a
disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence,
that age was the 'but-for' cause of the challenged adverse employment action," and that the
"burden of persuasion does not shift to the employer to show that it would have taken the action
regardless of age, even when a plaintiff has produced some evidence that age was one motivating
factor in that decision."  *Id.* at *23-24.
      Nevertheless, the distinction between Title VII and the ADEA is immaterial in this case,
because, as demonstrated below, Tucker's statutory discrimination claims fail at an earlier stage
in the Court's analysis, where both Title VII and the ADEA are analyzed the same.

(quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc)).  "For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Here, Tucker offers only a cursory and unsupported argument that she has presented direct evidence of discrimination.  In her brief in opposition, Tucker's entire argument regarding direct evidence consists of the following:

> Tucker has proffered direct evidence of age discrimination; [Supervisor] Deborah Czeschin ordered the removal and replacement of plaintiff upon her termination.  The other USPS who was under age 40 were mentored and invited to bid on plaintiff's position that helped their promotions.

(Doc. 38 at 6.)

Upon review, the Court concludes that this argument by Tucker does not demonstrate direct evidence of discrimination, and that Tucker otherwise has not presented any direct evidence that the USPS discriminated against her on the basis of sex, race, national origin, or age.  In fact, the Court notes that Tucker's argument does not cite or reference any *evidence* in the record – let alone *direct evidence* of discrimination – and the Court's independent search of the record did not reveal any sources suggesting that the "other USPS who was under age 40 were mentored and invited to bid on plaintiff's position that helped their promotions."  Further, even if such a source existed in the record, and there was a USPS employee under the age of 40 who replaced Tucker as a window clerk at the Rocky River Branch, the Court notes that such an action still would not constitute direct evidence of discrimination, but instead merely would satisfy one of the four requirements to establish a prima facie case under the circumstantial evidence approach. *See Kline*, 128 F.3d at 349 ("In order

-32-

to prove a prima facie case of discrimination, a plaintiff must show: . . . (4) that he was replaced by a person outside of the protected class.").

Accordingly, in order to survive summary judgment, Tucker must establish discrimination under Title VII and the ADEA by presenting circumstantial evidence under the familiar *McDonnell Douglas* burden-shifting framework.

> **b.      Tucker Has Not Presented Circumstantial Evidence Of Discrimination Under The *McDonnell Douglas* Burden-Shifting Framework**

The *McDonnell Douglas* burden-shifting framework involves three-stages. *Grossjean*, 349 F.3d at 335. First, the plaintiff bears the initial burden of demonstrating a prima facie case of discrimination. *Id.* Second, if the plaintiff demonstrates a prima facie case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* And third, if the defendant meets this obligation, the burden shifts back to the plaintiff to prove that the proffered nondiscriminatory reason was merely a pretext for discrimination. *Burdine*, 450 U.S. at 253, 255-56; *see also Manzer*, 29 F.3d at 1083 ("[O]nce the employer has come forward with a nondiscriminatory reason for firing the plaintiff, we hold that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."). At all times, however, the ultimate burden of persuasion remains with the plaintiff to establish that the adverse employment action was the result of unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

> **i.      Tucker Has Not Demonstrated A Prima Facie Case Of Discrimination**

To demonstrate a prima facie case of discrimination, the plaintiff must establish that: (1) she is a member of a protected class; (2) she was subject to an adverse employment action; (3) she was

qualified for her position; and (4) she was either replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Russell v. University of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) and *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)).

Here, the USPS challenges only the fourth element of Tucker's prima facie case, arguing that Tucker has not identified any similarly-situated, non-protected employee who was treated differently.[20]

To be considered a similarly-situated employee, the employee must "have dealt with the same supervisor [as the plaintiff], have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).[21] The plaintiff, however, need not demonstrate similarity in all of these respects; the Court will evaluate the above factors only to the extent that they are relevant to the particular circumstances of the case. *See Jackson*, 518 F.3d at 394. This caveat is important, because if the definition of

---

[20] The USPS implicitly concedes that Tucker is a member of a protected class under both Title VII and the ADEA, was subjected to an adverse employment action, and was qualified for her position. (*See generally* Docs. 34-2; 41.)

Other than Tucker's cursory argument in her brief in opposition that she was replaced by an individual under the age of 40 years old (*see* Doc. 38 at 6) – which the Court previously noted was wholly unsupported in the record – Tucker has asserted a disparate treatment discrimination claim (*see generally* Docs. 1, 38), and she argues that the fourth element of her prima facie case is met because similarly-situated, non-protected employees were treated differently.

[21] Subsequent Sixth Circuit opinions divide this passage from *Mitchell* into discrete factors to apply in determining whether the employee(s) to whom the plaintiff seeks to compare herself is "similarly-situated." *See, e.g.*, *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 396 (6th Cir. 2008). They are often referred to as the "*Mitchell* factors," and are as follows: that the employees to be compared (1) dealt with the same supervisor; (2) were subject to the same standards; and (3) engaged in the same conduct without distinguishing circumstances.

-34-

"similarly-situated employee" is too narrow, then an individual with unique job responsibilities would be precluded from asserting a potentially meritorious discrimination claim. *Id.* at 396-97. Thus, to satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar "in all of the relevant aspects." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated.'")).

In support of the fourth element of her prima facie case, Tucker identifies two subsets of employees she claims are similarly-situated and were treated more favorably. Upon review, however, even after properly weighing the evidence in the light most favorable to Tucker, the Court concludes that neither subset of identified employees is similarly-situated "in all of the relevant aspects" and that Tucker has failed to establish the fourth element of her prima facie case.

First, Tucker identifies two window clerks who worked at the Rocky River Branch: Raul Rodriguez and Erwin Lauffer. Tucker argues that Rodriguez and Lauffer are white male employees who were treated more favorably than she, because audits of their cash drawers were similarly "out of tolerance" (*i.e.*, over or short more than $5.00), but they were not disciplined. Tucker also asserts that Rodriguez and Lauffer frequently struck the "no sale" key during the day to make change, which she contends was a commonly utilized practice among clerks, and, again, unlike her, they were not disciplined. And finally, Tucker alleges, without citing any evidence in the record, that Inspector Morrison intentionally destroyed the videotapes of Rodriguez, Lauffer, and the other window clerks "doing the same keystrokes and 'no sale' conduct as that of [Tucker]," which rendered an "objective, unbiased review of the tapes . . . impossible." (Doc. 38 at 7.)

-35-

While the Court acknowledges that Rodriguez and Lauffer are non-protected employees under Title VII for purposes of Tucker's sex discrimination claim and that each held the same position as Tucker at the Rocky River Branch and reported to Supervisor Czeschin, the Court finds that there is no evidence that they engaged in the same relevant conduct as Tucker and that they therefore cannot be considered similarly-situated.[22]

First, Tucker's assertion that Rodriguez's and Lauffer's audits were equally "out of tolerance" is immaterial and is not relevant conduct, because Tucker's removal was not based upon her cash drawer being "out of tolerance."  Instead, as noted by Supervisor Czeschin and Manager Arrington, the removal was based upon Tucker's manipulation of the POS computer system, a far more serious offense.  (*See* Doc. 34-12 at 2-5; Doc. 41-4 at 2-3.)

Second, Rodriguez and Lauffer did not engage in the same relevant conduct, because, unlike Tucker, neither Rodriguez nor Lauffer were observed manipulating the POS computer system by using the "no sale" key to sell stamps, as opposed to using the "no sale" key merely to make change for customers.  During his investigation, Inspector Morrison observed videotape surveillance of seven window clerks of various races, genders, and ages – including Rodriguez and Lauffer – and Tucker was the only clerk observed improperly manipulating the POS computer system by using the "no sale" key to open her cash drawer when making a sale.  (*See* Doc. 38-12 at 16-22, 39; Doc. 34-6 at 79.)  Likewise, both Supervisor Czeschin and Manager Arrington declared that they had never observed a clerk using the "no sale" key to sell a book of stamps until they saw the videotape of Tucker engaging in this practice.  (Doc. 34-12 at 3-5; Doc. 41-4 at 3.)  Further, Tucker ultimately

---

[22]  As noted earlier, the Court recognizes that Rodriguez and Lauffer are both over the age of 40 years old (and thus are *not* non-protected employees under the ADEA) and that Rodriguez is Hispanic, not white (and thus is *not* a non-protected employee under Title VII for purposes of race and national origin).

admitted in her deposition that she did in fact hit the "no sale" key – not just to open her drawer for change – but when selling stamps, and that she knew that this behavior violated postal policy.[23]  In this regard, the Court determines that there is a crucial distinction between Rodriguez's and Lauffer's conduct of using the "no sale" key to make change, which the USPS concedes is a common practice among clerks, and Tucker's conduct of using the "no sale" key to sell stamps, which the USPS contends leaves the system vulnerable to losses and thefts.

And third, the Court notes that there is no evidence that Inspector Morrison intentionally destroyed the videotapes of Rodriguez and Lauffer (or the other clerks at the Rocky River Branch) and thereby concealed relevant conduct comparable to Tucker's, or otherwise performed the investigation in an improper and discriminatory manner.  According to Inspector Morrison's unrefuted testimony, he simply reused any videotapes that did not indicate a clerk was engaging in improper conduct because of financial considerations.  (Doc. 38-12 at 16-25, 38-39.)  Moreover, the Court notes that it is Tucker's burden to establish her prima facie case and identify a comparable non-protected employee who was treated more favorably, and without any showing of discrimination on the part of Inspector Morrison, the USPS cannot be charged with a failure to investigate, document, or provide an opportunity to review Tucker's discrimination claim in light of Inspector Morrison's reuse of the videotapes of Rodriguez, Lauffer, and the other clerks.  (*See* Doc. 38 at 4, 9.)

In short, Rodriguez and Lauffer (and the other clerks at the Rocky River Branch) did not

---

[23]  In light of Tucker's admission in her deposition and her own declaration that she used the "no sale" key when selling stamps, the declarations from the three APWU officials that they did not *see* or *observe* Tucker manipulating the POS computer system when reviewing Inspector Morrison's videotapes is not probative and thus insufficient to create a genuine issue of material fact.  (*Compare* Doc. 34-11 at 15 and Doc. 38-41 at 1 *with* Doc. 38-27 at 2, Doc. 38-38 at 2, and Doc. 38-40 at 2.)

engage in the same relevant conduct, and they therefore cannot be deemed similarly-situated to Tucker. *Accord Barry v. Noble Metal Processing, Inc.*, 276 Fed. Appx. 477, 483-84 (6th Cir. 2008) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002) and *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000)).

In the second subset of employees, Tucker identifies four workers in her Complaint that she alleges were disciplined by Manager Arrington and had filed grievances that were settled at Step Two of the grievance process, but were allowed to return to work at the USPS without being subsequently removed:  Karen Brooks, Sillus Cox, Carl Gunn, and Steve Zabak.  In her brief in opposition, however, Tucker fails to mention or discuss Karen Brooks.  Instead, Tucker addresses only Sillus Cox, Carl Gunn, and Steve Zabak, stating as follows without any citations to the record or case law:

> [Manager] Arrington was the concurring supervisor for the employment action against plaintiff, Tucker, and also Silus [*sic*] Cox and Steven Zabak who were brought back to work and continued in their positions.
>
> . . .
>
> Charliene Arrington was the concurring official on the Emergency Placement and Removal for Ms. Tucker.  Ms. Arrington was the concurring official on the disciplinary actions regarding Steve Zabak and Carl Gunn (two men 40 years old). Zabak was returned to service after he admitted taking postal funds, and C. Gunn was returned to work by the same settlement agreement procedure Ms. Tucker had under gone with Ms. Jacqueline Anderson on June 7, 2004. The Inspectors did not question these men's settlements as to why they were returned to duty.  They were not recharged and placed on administrative leave as Ms. Tucker experienced.  The investigation of the postal inspector again focused only on the African American, woman Morrison starts with in January 2004.  (60 years old and near retirement) [*sic*] Yet, he admits he never saw her take any funds or property out of the post office while she is charged with taking $162.00 and owing this to the USPS.
>
> . . .
>
> The younger men and women who received settlements of their grievances returning

-38-

them to work on June 7, 2004 [unidentified by Tucker] were treated more favorably than Ms. Tucker.  They were comparable [*sic*] situated, and Charliene Arrington was the concurring official on those disciplinary actions.

(Doc. 38 at 5, 12-14.)  In addition, Tucker submits declarations with her brief in opposition from four

APWU representatives who referenced the four identified employees:

The white employees and male employees who grieved their disciplinary actions who were returned to work, Steve Zabak, Carl Gunn, Karen Brooks and Sillus Cox, were treated differently, based on the settlement of their cases the same date as Ms. Tucker and their return to their positions were allowed to stand.  The same "Concurring Authority," Charliene Arrington charged those employees with similar infractions, but they were treated differently due to their race and gender.

(Doc. 38-38 at 3; Doc. 38-39 at 1-2; Doc. 38-40 at 2; *see also* Doc. 38-27 at 2.)

Like Rodriguez and Lauffer (and the other clerks at the Rocky River Branch), the Court finds

that Brooks, Cox, Gunn, and Zabak also are not similarly-situated to Tucker for purposes of

establishing the fourth element of her prima facie case.

First, with respect to all four of these identified employees, it is undisputed that none worked

at the Rocky River Branch or were immediately supervised by Supervisor Czeschin – the USPS

employee who initiated and recommended Tucker's emergency placement and removal. (Doc. 34-12

at 5.)  Therefore, these four employees did not deal with the "same supervisor" as Tucker and cannot

be considered similarly-situated.  *See Mitchell*, 964 F.2d at 583; *see also Berry v. City of Pontiac*,

269 Fed. Appx. 545, 549-550 (6th Cir. 2008) (finding that, although the same individual ultimately

approved two employees' disciplinary actions, the two employees were not similarly situated,

because the approval was based upon the recommendations of two different immediate supervisors);

*cf. Neely v. United States Postal Serv.*, 307 Fed. Appx. 681, 683-684 (3d Cir. 2009).

Second, even if the Court were to broadly construe the term "supervisor" to incorporate the

"ultimate decision-maker" under the circumstances of this case, *see Berry*, 276 Fed. Appx. at 481

-39-

(citing *McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005)), and were to accept the statements

in the APWU representatives' declarations that Manager Arrington was the "Concurring Authority"

for the four employees' disciplinary actions and hence the "ultimate decision-maker," there are still

other bases as to why these four identified employees are not similarly-situated to Tucker.[24]

Specifically, with respect to Brooks, Cox, and Gunn – who Tucker claims were treated

differently, because they were not subsequently removed by the USPS after the settlement of their

grievances at Step Two of the grievance process – the Court finds that they are not similarly-situated

to Tucker, because the express terms of their settlement agreements resolved grievances challenging

both their emergency placements *and* their notice of removals, whereas Tucker's settlement dealt

only with her emergency placement grievance.  (*Compare* Doc. 38-29, Doc. 38-30, and Doc. 38-31

*with* Doc. 38-28; *see also* Doc. 34-4 at 3.)  In fact, at the time of Tucker's settlement on June 7,

2004, the USPS still had not even finalized or issued Tucker's notice of removal, which meant that

the settlement could not possibly have resolved an as-of-yet nonexistent notice of removal or

grievance thereof.  (*See* Doc. 38-25 at 49-50.)  So, unlike Brooks, Cox, and Gunn, Tucker was still

subject to removal after her Step Two settlement, and they consequently cannot be considered

---

[24]  While the Court must view the evidence in the light most favorable to Tucker at the
summary judgment stage and therefore accepts, at this stage, that Manager Arrington was the
"Concurring Authority" for the four employees' disciplinary actions based on the APWU
representatives' declarations, the Court notes that there is only supporting documentation for this
proposition with respect to Steve Zabak.  (*See* Doc. 38-11 at 3.)  By contrast, Manager Arrington
declares that she "was not the second-line supervisor of Carl Gunn, Karen Brooks, and Sillus
Cox."  (Doc. 41-4 at 3.)  Further, a USPS Labor Relations Representative, Christopher Beebe,
declares that Carl Gunn, Karen Brooks, and Sillus Cox did not report to Manager Arrington.
(Doc. 34-4 at 3, Beebe Decl.)

similarly-situated to Tucker.[25]

Likewise, with respect to Zabak – who Tucker lumps in the same category as Brooks, Cox, and Gunn and argues that he is similarly-situated based on the Step Two settlement of his grievances (*see, e.g.*, Doc. 1 at 4; Doc. 38-38 at 3) – the Court finds that he is not similarly-situated to Tucker, because at the time of his disciplinary action, Zabak was a supervisory employee (*see* Doc. 34-4 at 3; Doc. 38-11) and therefore subject to differing standards.  *Mitchell*, 964 F.2d at 583; *cf. Alfrey v. AK Steel Corp.*, 211 Fed. Appx. 393, 396 (6th Cir. 2006) ("Duane Rush was not subject to the same standards as [Plaintiff], because he held a job subordinate to [Plaintiff's].");  *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000) (noting that plaintiff's attempted comparison between non-supervisory and supervisory employees was not "legally relevant," because the employees could

---

[25]  The Court also notes that Tucker has not presented "specific facts" showing that Brooks, Cox, and Gunn engaged in similar conduct as Tucker, other than the bald assertions made by the APWU representatives that Manager Arrington "charged those employees with similar infractions."  (Doc. 38-38 at 3; Doc. 38-39 at 1-2; Doc. 38-40 at 2; *see also* Doc. 38-27 at 2.)  While the Court has addressed Tucker's argument on different grounds, the Court notes that "mere conclusory and unsupported allegations, rooted in speculation, do not meet the burden of demonstrating that there is a genuine issue for trial" under Fed. R. Civ. P. 56.  *Innovative Case, Inc. v. Tweedle Litho Co.*, 147 Fed. Appx. 467, 473 (6th Cir. 2005) (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003)).

Moreover, the Court observes that Brooks cannot be considered similarly situated to Tucker, because Brooks is *not* a non-protected employee under Title VII, and Tucker has failed to satisfy her burden to show that Brooks is a non-protected employee under the ADEA.  Brooks is an African-American female (*see* Doc. 41-2 at 1, Second Beebe Decl.), and Tucker has not presented any evidence regarding Brooks' age, let alone evidence that Brooks is a person under the age of 40 years old or significantly younger than Tucker, *see Ricks*, 2009 U.S. Dist. LEXIS 27140, at *11-13.

not be deemed similarly situated under the circumstances of the case).[26]  As a supervisory employee,

Zabak could (and did) appeal for review of the USPS' disciplinary action to the Merit Systems

Protection Board ("MSPB"), which reviews penalties according to the factors outlined in *Douglas*

*v. Veterans Admin.*, 5 M.S.P.B. 280, 306 (M.S.P.B. 1981).  (*See* Doc. 34-4 at 3; Doc. 38-11.)  By

contrast, Tucker and other postal employees who are covered by collective bargaining agreements

"must avail themselves of the arbitration provisions of the contract" or, in Tucker's case, the CBA

by and between the USPS and the APWU.  *Floyd v. United States Postal Serv.*, No. 96-3991, 1997

WL 659676, at *1 (6th Cir. Oct. 22, 1997).  Thus, irrespective of their conduct, and notwithstanding

who is considered the ultimate decision maker involved, a supervisory employee like Zabak and a

member of the APWU like Tucker are subject to different standards governing discipline and cannot

be deemed similarly situated in this case.

Accordingly, in light of all of the foregoing, the Court concludes that Tucker has not

identified a similarly-situated, non-protected employee who was treated more favorably, and that she

has not established the fourth element of her prima facie case under the *McDonnell Douglas* burden-

shifting framework.  On this basis, the USPS is entitled to summary judgment on Tucker's Title VII

and ADEA discrimination claims.

---

[26]  Although not addressed by Tucker, documents in the record indicate that Zabak was a
Supervisor of Customer Service who admitted to adjusting the floor stock counts at a branch in
Beachwood, Ohio and was charged with conduct unbecoming a postal service employee,
falsification of financial records, and disruption of postal service operations.  (Doc. 38-11.)
Based on those charges, Zabak was demoted to the position of Part-Time Flexible Letter Carrier.
(*Id.*)  The deciding official in Zabak's disciplinary action was Manager Arrington.  (*Id.*)

       **ii.**     **The USPS Has Articulated A Legitimate, Nondiscriminatory Reason For Tucker's Removal, And Tucker Has Not Demonstrated That The Proffered Reason Was Merely A Pretext For Discrimination**

Assuming, *arguendo*, that Tucker could establish a prima facie case of discrimination utilizing the circumstantial evidence approach, Tucker still has not shown how the USPS' articulated reason for removing her was a pretext for discrimination based on sex, race, national origin, or age.

As noted, at the second stage of the *McDonnell Douglas* burden-shifting framework, the defendant must articulate some legitimate, nondiscriminatory reason for the adverse employment action at issue. *Grossjean*, 349 F.3d at 335.

Here, the Court finds that the USPS has met its burden and articulated a legitimate, nondiscriminatory reason for Tucker's removal:  Tucker violated postal policies and procedures as outlined in the Notice of Removal dated June 18, 2004.  Based upon Inspector Morrison's IM, the videotapes, and Tucker's interview responses, Tucker was charged with conduct unbecoming a postal employee, failure to account for postal funds, and falsification of postal records.  (Doc. 34-6 at 25-30.)  In particular, Tucker was observed manipulating the POS computer system on six separate dates – all of which revealed that Tucker failed to properly account for a total of $162.80 in postal funds – and the USPS concluded that her improper use of the "no sale" function left the system vulnerable to losses and theft.  (*See id.*; Doc. 34-12; Doc. 41-4.)  Further, at the time of the USPS' decision to remove Tucker, she denied ever manipulating the POS computer system and provided no explanation for her actions.  (*See, e.g.*, Doc. 34-6 at 72-74.)  Now, in the context of this lawsuit, Tucker has admitted that she improperly used the "no sale" function in violation of established postal procedures – *i.e.*, she used the "no sale" function when selling stamps, as opposed to using the "no

-43-

sale" function only when making change.  (*See* Doc. 34-11 at 15; Doc. 38-41 at 1.)[27]

Therefore, because the USPS has offered a legitimate, nondiscriminatory reason for Tucker's removal, if Tucker had established a prima facie case, it now would be incumbent upon Tucker at stage three of the *McDonnell Douglas* burden-shifting framework to come forward with evidence explaining how the USPS' proffered reason was, in fact, a pretext for discrimination.

The Sixth Circuit has set forth three ways in which a plaintiff can meet her burden of showing pretext. *Manzer*, 29 F.3d at 1084.  First, the plaintiff can show that the proffered reason had no basis in fact or was factually false.  *Id.*  Second, the plaintiff can show that the proffered reason did not actually motivate the adverse action.  *Id.*  And third, the plaintiff can show that the proffered reason was insufficient to merit the adverse action.  *Id.*  Regardless of which method is utilized, the plaintiff at this stage "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id.* at 1083.

Here, Tucker does not reference any of the three methods outlined by the Sixth Circuit, but she appears to argue that the USPS' basis for her removal was a pretext for discrimination, because: (1) the postal inspectors improperly focused their investigation on her; (2) the postal inspectors were inappropriately involved in her discipline; (3) the circumstances of the June 7, 2004 settlement agreement belied the USPS' position that she was in a different stage of discipline at the time of the settlement (*see* Doc. 38 at 14 ("The lies and finger pointing by the USPS is clear evidence there is

---

[27]  The Court also notes that the arbitration decision finding just cause for the USPS' removal of Tucker is further evidence that the USPS satisfied its burden at stage two of the *McDonnell Douglas* burden-shifting framework.  *See Jasany v. United Postal Serv.*, 755 F.2d 1244, 1252 (6th Cir. 1985) ("While the outcome of an arbitration decision in favor of the employer is not dispositive of a Title VII suit of whether there was discrimination, an arbitration decision in favor of the employer is sufficient to carry the employer's burden of *articulating* some legitimate, nondiscriminatory reason for the employee's rejection.") (internal citation and quotations omitted) (emphasis in original).

a pretext when they claim Ms. Tucker was in a different stage of disciplines [*sic*] and deny the Inspectors participated in the disciplinary actions of the USPS.")); and (4) the USPS had an "incessant drive to get plaintiff, arguably for a perceived theft of $162.80, [which] appears out of place in view of the far larger loss of $4,879.59," the amount of money that the Rocky River Branch was shown to have lost based on a series of audits completed in late 2003 (*see, e.g.*, *id.* at 8).

Upon review, however, the Court concludes that Tucker's arguments are unpersuasive, and that she has failed to present any evidence that the USPS' decision to remove her was based upon sex, race, national origin, or age. There simply is no evidence in the record that the USPS removed Tucker based in whole or in part on unlawful discrimination or that its stated reason for the removal was merely a pretext. Instead, there is clear support in the record that the USPS removed Tucker, because she violated postal policies and procedures – and notably, based on her admissions in this case, essentially concedes she lied about not violating.

In response to Tucker's arguments, the Court first notes that there is no evidence in the record that the postal inspectors – including Inspector Morrison – performed the investigation of the Rocky River Branch in a discriminatory manner or improperly focused the investigation on Tucker. While Inspector Morrison initially observed all of the window clerks at the Rocky River Branch, the investigation ultimately focused on Tucker, because she was the only clerk that he observed manipulating the POS computer system. (*See* Doc. 38-12 at 16-25, 38-39.) As Inspector Morrison testified, he did not retain any videotapes of the other six clerks, because they were not observed engaging in improper conduct. (*See id.*) The Court therefore finds that Tucker's assertions that the postal inspectors failed to investigate or provide substantiation of the investigation and that this failure "was an egregious violation of equal protection" and "discriminatory" (*see* Doc. 38 at 9, 11)

are merely unsupported allegations that do not satisfy Tucker's burden to show pretext, *see Bell*, 351 F.3d at 253.

Second, to the extent that there is evidence in the record indicating that postal inspectors were involved in the USPS' decision to discipline Tucker – *e.g.*, the reference to unidentified inspectors' actions after the June 7, 2004 settlement of Tucker's emergency placement grievance – the Court notes that there is no evidence in the record that the inspectors were motivated by a discriminatory animus.  For example, the Court finds Tucker's claim that the inspectors acted in a discriminatory manner because they did not question the USPS' settlements of Steve Zabak's and Carl Gunn's grievances but focused on and challenged the USPS' settlement of Tucker's – *i.e.*, an African American woman's – grievance to be totally lacking in evidentiary support.  (*See* Doc. 38 at 12-13.) Instead, Tucker once again merely has raised and relied upon unsupported allegations that are insufficient to satisfy her burden.  *See Bell*, 351 F.3d at 253.

Third, the Court notes that there is no evidence in the record that the circumstances surrounding the June 7, 2004 settlement of Tucker's emergency placement grievance insinuate that the USPS acted in a discriminatory fashion or that its reason for Tucker's removal was a pretext. Contrary to Tucker's assertion, Acting USPS Labor Relations Specialist Poindexter-Anderson was not in the position to return Tucker to work after her removal.  (*See* Doc. 38 at 13; Doc. 38-25 at 49-50.)  Instead, as noted, at the time of Tucker's settlement, Poindexter-Anderson could not possibly have resolved an as-of-yet nonexistent notice of removal or grievance thereof, and, as evidenced by the express terms of the agreement, the settlement addressed only Tucker's emergency placement grievance.  (*See* Doc. 38-25 at 49-50; Doc. 38-28 at 1.)  Further, the fact that Poindexter-Anderson was ultimately reprimanded and reassigned from Labor Relations after the settlement of Tucker's

grievance is not evidence supporting Tucker's claim that the USPS discriminated against her or that the USPS' position that it still could remove Tucker despite the settlement agreement "was a pretext and based on a lie." (*See* Doc. 38 at 13.)  Poindexter-Anderson admitted that she should have investigated Tucker's grievance more thoroughly before agreeing to the settlement (*see* Doc. 38-25 at 24-33), and Poindexter-Anderson's failure to fully investigate the grievance appears to be the basis for the USPS' decision to investigate Tucker's settlement (and the other settlements executed on June 7, 2004) and to reassign Poindexter-Anderson from her temporary position in Labor Relations. This investigation of Poindexter-Anderson had no effect on the ultimate disposition of Tucker's employment situation with the USPS.  In sum, the Court finds that, once more, Tucker has inappropriately relied upon unsupported allegations that are insufficient to satisfy her burden. *See Bell*, 351 F.3d at 253.

And fourth, the Court notes that Tucker has not produced sufficient evidence that the USPS had an "incessant drive to get plaintiff," such that a jury could reasonably reject its explanation for removing Tucker. *See Manzer*, 29 F.3d at 1083.  While Tucker was charged with failing to properly account for only $162.80 in postal funds, and there were documents in the record indicating that the Rocky River Branch had total losses between approximately $4,000 and $8,000 in late 2003, Tucker does not cite any persuasive evidence that the USPS had an improper (and certainly not a discriminatory) motive in seeking to remove Tucker.  For example, in her brief in opposition, Tucker claims that Supervisor Czeschin's actions suggested that she intended to "injure" Tucker "at all costs." (*See* Doc. 38 at 7-8.)  In support of this proposition, Tucker cites a letter dated May 29, 2004 from Supervisor Czeschin to Inspector Morrison, stating that Tucker was going to be removed. Tucker writes that, when one considers this letter, it is quite plausible that "[b]ecause of the disparity

-47-

of the parties involved, white and black, the only explanation for this disparate treatment is racial and sex discrimination." (Doc. 38 at 8.)  Upon examination of the letter and Inspector Morrison's testimony about the letter, however, the Court finds this claim to be completely without merit. Supervisor Czeschin's letter merely informs Inspector Morrison that she had requested that Tucker be removed from the USPS, that she had sent a request for disciplinary action to Manager Arrington for concurrence, and that she would forward a copy of the removal letter to Inspector Morrison upon receipt. (Doc. 38-19.)[28]  Further, Inspector Morrison testified that Supervisor Czeschin probably sent him this letter to keep him informed, because the first page of the IM regarding Tucker advises supervisors to keep him informed or to tell him "what disciplinary action they decided to take." (Doc. 38-12 at 45; *see also* Doc. 34-6 at 75 (requesting that Tucker's supervisors advise Inspector Morrison in writing of their decision of whether to initiate disciplinary actions).)  Yet again, therefore, the Court finds that Tucker has merely relied upon unsupported allegations, "rooted in speculation," that are insufficient to meet her burden.  *See Bell*, 351 F.3d at 253.

In addition, the Court affirmatively notes that Tucker has failed to show pretext under any

---

[28]  The entire text of the letter is as follows:

May 29, 2004

Dean,

I have sent a request for disciplinary action to Charliene Arrington.  It is my understanding, that she has to be the concurring official, since I am Acting Manager.  I requested removal, and will forward a copy of the letter to you, when I receive it.

Thank you,

D. Czeschin

(*Id.*)

-48-

of the three methods outlined by the Sixth Circuit. *See Manzer*, 29 F.3d at 1084.

First, Tucker now admits that she engaged in the conduct for which the USPS based its decision to remove her – *e.g.*, she admits using the "no sale" function when selling stamps, as opposed to using the "no sale" function only when making change – and she concedes that her conduct was "bad" and in violation of postal policy. (*See* Doc. 34-11 at 15; Doc. 38-41 at 1.)  Thus, Tucker cannot establish that the USPS' proffered reason for her removal had no basis in fact or was factually false. *Accord Pickett v. Potter*, No. 04-CV-73722-DT, 2005 WL 3465723, at *10 (Dec. 15, 2005).

Likewise, Tucker has not shown that the USPS' proffered reason did not actually motivate her removal or was insufficient to merit the removal.  As discussed above, Tucker has not identified any employees in a protected class who were not removed even though they engaged in substantially identical conduct to that which the USPS contends motivated its removal of Tucker. *See Manzer*, 29 F.3d at 1084 (explaining how a plaintiff can show that the defendant's proffered reason was a pretext under the third method identified by the Sixth Circuit).  Tucker also has not attacked the credibility of the USPS' proffered reason for removing Tucker, such that the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the [USPS'] explanation is a pretext, or coverup." *See id.* (explaining how a plaintiff can show that the defendant's proffered reason was a pretext under the second method identified by the Sixth Circuit).  In this regard, the Court notes that both Supervisor Czeschin and Manager Arrington declared, in unrefuted statements, that Tucker's manipulation of the POS computer system was a practice that they had never previously observed and that they considered to be an extreme departure from accepted postal procedure that left the system vulnerable to losses and theft.  (Doc. 34-12 at 3-5;

-49-

Doc. 41-4 at 2-3.)[29]  As such, both Supervisor Czeschin and Manager Arrington declared that this practice was serious enough to justify removal, even though Tucker was not observed stealing or charged with theft herself.  (*See id.*)  The Court also notes that, at the time of the USPS' decision to remove Tucker, she continually denied ever manipulating the POS computer system and provided no explanation for her actions.  (*See, e.g.*, Doc. 34-6 at 72-74.)  Therefore, Tucker's post-Complaint explanation – *i.e.*, that she manipulated the POS computer system in an attempt to reduce the length of the lines at the Rocky River Branch – is immaterial and cannot be used on a post-hoc basis for finding that the USPS' decision was improper, let alone discriminatory.

Accordingly, in light of all of the foregoing, the Court concludes that Tucker has not established that the USPS' proffered nondiscriminatory reason was merely a pretext for discrimination – *i.e.*, Tucker has not produced "sufficient evidence from which the jury may reasonably reject the [USPS'] explanation."  *Manzer*, 29 F.3d at 1083.  Tucker simply has not presented any evidence that the USPS discriminated against her on the basis of sex, race, national origin, or age.  For this additional reason, the USPS is entitled to summary judgment on Tucker's Title VII and ADEA discrimination claims.

* * *

In sum, therefore, Tucker's Title VII and ADEA discrimination claims fail as a matter of law, because Tucker has not established a prima facie case of discrimination, and, alternatively, because there is not a genuine issue of material fact to dispute that the USPS' reason for removing Tucker was legitimate and nondiscriminatory.

---

[29]  The Court notes that these are unrefuted statements, because there is nothing in the record suggesting that Tucker deposed Supervisor Czeschin or Manager Arrington, despite Tucker's claim that these two individuals were the USPS' officials who unlawfully discriminated against her.  (*See* Doc. 1.)

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, the Court **DENIES** the USPS' *Motion to Strike* (Doc. 42)

and **GRANTS** the USPS' *Motion to Dismiss and for Summary Judgment* (Doc. 34).

**IT IS SO ORDERED.**

*/s/Kathleen M. O'Malley*
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated:  July 6, 2009**